UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

JOAN ROE, )
)
        Plaintiff )
v. ) CASE NO. 4:08-CV-01474
)
SAINT LOUIS UNIVERSITY, et al., )
)
        Defendants )

## PLAINTIFF JOAN ROE'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56(d) RESPONSE TO ST. LOUIS UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL POSTURE

In response to a Motion for Summary Judgment filed by Defendant St. Louis University ("MSJ"), Plaintiff Joan Roe two days ago filed a Declaration of the need for essential discovery to be produced, or the matter adjudicated, prior to, or instead of, the adjudication of the MSJ, pursuant to Federal Rule 56(d). (Docket 251). This memorandum is meant to further elucidate the necessary discovery as described in the 56(d) response. The Court has granted Plaintiff's request that this further explanation of the Rule 56(d) response be filed on this date. (Docket 253).

### INTRODUCTION

Joan Roe was capable and diligent high school student (Exhibit 1: SAT scores of 600 Composition, 560 verbal, 520 Math)(Exhibit 2: 3.1 GPA) with a record of no disciplinary issues of any nature. (Exhibit 3). Joan was also a more than capable, and in fact exceptional, athlete completely dedicated to her sport, field hockey. She was listed in

1

the National Federation of High Schools Record Book as holding two national high school field hockey records for goalkeepers (Exhibit 7).

Joan was also very respectful of those who work with athletes to train and condition them to play at high levels. She worked with many of them at the Atlantic Coast Athletic Club, where Joan worked as a swimming instructor beginning with the day she turned old enough to hold a senior lifesaving certificate and ending 3 year later when she left home to go to SLU. (Exhibit 8 at 70, Exhibit 9).[1]

Joan Roe accepted an athletic scholarship to St. Louis University, and matriculated in the Fall of 2006. Exhibit 12. Her tenure was short lived, and left her with emotional and physical scars that she will carry forever.

Joan suffered a minor back injury in connection with her field hockey regimen. Due to the negligence of the athletic department in rehabilitating her back – or rather, not rehabilitating, but working out and practicing (in violation of SLU's doctors' orders), this was exacerbated into a herniated, and displaced, disk, which was confirmed by MRI studies and will require at least two surgeries to correct. (Exhibits 4, 5, and 6).

Worse still, she suffered a sexual assault at a party over Halloween weekend of her freshman year. Perhaps worst of all, the day after this was reported to the athletic department, she was suspended from the field hockey team. Two weeks later, she was terminated from the team. This gross violation of Title IX not surprisingly caused her severe emotional distress. Now, more than five years later, she is doing much better.

---

[1] Exhibit 10 is Joan's resume sent to SLU at the request of former SLU Head Coach Whitehead, on the suggestion of renowned field hockey coach Diane Horsey, who had been Coach Whitehead's high school coach. The legendary Double Goal Coach (one who seeks to improve the lives of her players as well as to try and win games) took a moment with Joan and offered to recommend her for university athletic scholarships to all 6 NCAA Division 1 schools then being coached by former players of Coach Horsey. These were the sorts of coaches Joan had encountered before accepting a scholarship at SLU. Exhibit 11.

2

The trauma she suffered though – not just having been assaulted, but by having her whole world turned upside down by Defendant in the assault's immediate aftermath – leaves her scars that will never fully heal.

Against all this, Defendant SLU brings a Motion for Summary Judgment – as to all of Joan Roe's claims. Defendant relies upon dozens of facts. Most, to Plaintiff's belief, are not material. However, she cannot know whether the Court will so agree. Plaintiff does know, however, that additional discovery is necessary not only to rebut many of these purported undisputed facts, but also to oppose Defendant's motion by citing to additional facts that would overwhelm all the purported undisputed facts in any event.

Indeed, the additional facts that Joan Roe can prove render summary judgment appropriate in *her* favor. She believes that is the case already. If not, it undoubtedly will be once the discovery identified below is produced, or alternatively, the discovery sanctions described below are adjudicated.

## ARGUMENT

### 1.     Legal Basis

Under Federal Rule of Civil Procedure 56(d)(1)(2) and (3), if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1) defer considering the motion or deny it;
    (2) allow time to obtain affidavits or declarations or to take discovery; or
    (3) issue any other appropriate order.

In this instance the Court should either deny the motion or defer it, and should allow time for necessary discovery. The Court should also issue orders for failure-to-preserve sanctions which will render the motion for summary judgment moot.

3

**2.     Essential Facts to Justify Plaintiff's Opposition Cannot Yet Be Presented**

Plaintiff's opposition to Defendant's MSJ will be justified by facts that fall into two categories: 1) facts relevant to Plaintiff's Title IX claims for SLU's having responded with deliberate indifference to the report of Plaintiff's sexual assault; and 2) facts relevant to Plaintiff's back-injury claims for Defendant having acted negligently in response to a minor back injury that was unnecessarily exacerbated into a major back injury which will require at least two surgeries.

## TITLE IX

One of the predicates for a Title IX claim against an educational institution is that a defendant acted with "deliberate indifference" to the report of a sexual assault. In making this determination, the trier of fact looks to all the circumstances in response to the report, to see if the response was unreasonable. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999). Such circumstances include, for example, whether an investigation was undertaken, whether the assailant or others were confronted by the institution, what sorts of accommodations were made for the victim, etc. (Several cases with examples will be cited should a Rule 56 (c) response to the MSJ be necessitated in the future).

In this case, Joan Roe claims that Defendant failed to do many things that were mandated under Title IX, and did others quite improperly. Moreover, Defendant argues that not only did Defendant SLU fail to take reasonable measures to accommodate her and protect her (and other potential victims), but the Defendant actually took affirmative steps *against* her following the report of the assault, such as suspending her from the field hockey team, increasing her workload, monitoring her for the purpose of confronting her

4

over shortcomings, and ultimately terminating her from the field hockey team – all within two weeks of the report of her sexual assault.

Defendant's purported undisputed facts that touch upon Plaintiff's Title IX claim can be lumped into three categories: Joan Roe was a bad student and that's why she was suspended and terminated from the field hockey team (rather than in retaliation or to sweep the sexual assault under the rug); Defendant SLU took actions to help her after the report of the sexual assault; and SLU did a meaningful investigation. (SUMF Fact Nos. 10-12, 16-48, 57-104).

In Defendant's memorandum in support, Defendant argues the same points and one or two larger themes: that Joan was suspended, and later terminated from the team because of bad grades (p.4); that SLU did a lot of good things for Joan after learning of the sexual assault (pp. 5-8)(Clark, Oberle, and Charles); that SLU started an investigation immediately (p.19); that no evidence "even suggests" that Defendant's response was deliberately indifferent (p 21-27); and that while SLU was attempting to investigate, she did not name her assailant – thus, presumably, hindering SLU's ability to investigate. (pp. 5-6).

Plaintiff will dispute all the "facts" and arguments above. For example, she will argue that an investigation could have been undertaken despite Joan's failure to identify her assailant, but SLU chose not to, for other reasons. That SLU neglected to do nearly everything required by Title IX, including referring her to a Title IX coordinator, and offering common-sense accommodations. That rather than trying to help Joan, SLU instead took the opposite tack, increasing her workload, removing her from the field

5

hockey team, and searching for a reason to terminate her. That SLU chose to terminate her for other reasons than academic reasons.

There are several essential documents that have not been produced by Defendant that could belie Defendant's purported undisputed facts, disprove its arguments, and prove Plaintiff's facts and arguments beyond question. These documents are as follows:

(A) Documents That Touch On All Facets Of the Title IX Case:

- **Head Coach's Team Binder / Calendar**

Head field-hockey coach Marcie Boyer, like all other Division 1 coaches, kept a team notebook. (Exhibit 13 at 104:3-5). This notebook included "all my drills and everything I did with [the field hockey players]." (Id. at 105:8-107:1). This notebook also included information concerning the medical issues facing her players. (Id. at 104:2-105:7). It is safely assumed that this binder also contained notes as to all issues, thoughts, and concerns regarding the individual players.

Ms. Boyer, at her deposition, stated that the binder was in her storage unit, and that she would retrieve it and produce it, through counsel. (Id. at 105:8-107:1).

It has not been produced, however.

This notebook should well have information pertaining to Joan Roe that is critical to the Title IX case. For example, what was the reason for no investigation into Joan's assault for over a month? Did her head coach disbelieve her? Did Joan's grades improve after her midterm grades, rebutting SLU's characterization of having terminated her for grades? Was her head coach looking for a reason to get rid of Joan Roe, and afraid that an ongoing investigation would stymie her efforts? Rather than being let go for poor academic reasons (which SLU argues are allowed, and that thus do not reflect "deliberate

6

indifference" to her following her sexual assault), was Joan Roe really let go because of her back injury? Because she was emotionally devastated after her sexual assault? Was it a combination of her physical and emotional state, rendering her a non-useful goalie?

None of the above is far-fetched, and in fact may already be inferred from circumstantial evidence. Aside from being assaulted just before her November 1 suspension, Joan's MRI revealing a herniated disc was reported on November 10. (Exhibit 14). On November 15 Joan was removed from the team. (Exhibit 15). One week later Ms. Boyer traveled to the nationally-recognized premier field hockey showcase, searching for a goalie. (Exhibit 13 at 28:9-29:18, Exhibit 16). Did her coach simply want more scholarship money available to offer to a new goalie?

Further, Ms. Boyer's complete unconcern for Joan's well-being in the immediate aftermath of the reported sexual assault was unabashedly testified to – by Ms. Boyer herself. She acknowledged that it never crossed her mind that the best course of action might not be to suspend her the day after the report of the rape, nor to not terminate her two weeks later to the day. (Exhibit 13 at 123: 9 – 124:6).

Lastly, Ms. Boyer's credibility is at issue. She stated quite clearly that her binder was in her storage unit, but would be produced subsequent to her deposition. It was not. Her excuse for putting into storage is also recently called into question. In her deposition she stated that the reason she put the binder in storage was that she kept it "to be used in case [she] ever coached again . . . " (Exhibit 13 at 105:21-24). She also testified that she was a substitute elementary school teacher. (Id. at 10:8). A subsequent internet search, however, indicates that Ms. Boyer was, again, coaching – specifically from the time before her deposition:

7

"Marcie Boyer is deep into her first season as the field hockey coach at Harrisburg Academy. . . .

In her own words, she 'retired' from college coaching in December 2008 but was lured back to the coaching ranks this year.

'Its quite different than coaching at the college level, Boyer said, "but the decrease in my stress level has been great."

The *Patriot News* (a Central Pennsylvania newspaper), dated October 9, 2009.

(Exhibit 17).

- **Assistant Coach's Team Binder / Calendar**

The current head coach for field hockey at SLU, Lauren Bruce, was the assistant coach for Ms. Boyer at SLU in 2006. Like Ms. Boyer (and all Division 1 coaches), Ms. Bruce kept a team notebook. (Exhibit 18 at 121:8-12).

Assistant coach Bruce's notebook likewise has not been produced.

(B) Documents That Touch On The Investigation, Or Failure To Investigate, And How High Up That Decision Went

Joan's team captains reported the sexual assault to the NCAA compliance officer, Janet Oberle, on November 1, 2006. Ms. Oberle kept notes indicating that she reported this to Defendant's police department, the Department of Public Safety ("DPS") the next day, November 2, 2006. (Exhibit 19 at 187: 16-24 and 210:22-25). The officer purportedly in charge of the "investigation" was Larry Purvis. In his declaration attached to the pending motion for summary judgment (Docket 244, Ex. 13) he testifies that he began his investigation more than a month later, after receiving a call from Joan Roe's father on December 19, 2006.

This failure to investigate is, in itself, cause to find Defendant acted with deliberate indifference. However, many questions are left unanswered. Most

8

particularly, why? Or, alternatively, was an investigation commenced earlier? If so, what did it find? What was done upon learning whatever may have been learned? Who directed the investigation, or dictated the lack of one? Did the decision tree lead all the way to the President of the University? Several key documents that should exist, or have existed, that would potentially answer these questions, have not been produced.

- **Any Documents or Notes Reflecting Oberle Contacting DPS**

There is no record reflecting Ms. Oberle's contact with DPS on November 2, 2006. Surely Ms. Oberle kept notes? She kept notes of her conversations with Joan Roe, Corey S., and Angela, after all, and notes indicating that she intended to contact DPS. (Exhibit 20). Surely the DPS officer took some notes of the report? Entered the report onto a log of some sort? Yet nothing has been produced regarding what was said, or what DPS did, or did not do, immediately afterward.

- **Email From Head of DPS To Office of the President, and Any Response or Other Attendant Documents, Are All Missing**

The Director of DPS, Jack Titone, emailed the University President's executive assistant, Bridget Fletcher, on or about November 4, 2006, to inform the President of the report of the sexual assault. He also stated that Officer Purvis was "working the case." This is reported in a "Hot Topics" document, attached as Exhibit 21. University Vice President for Student Development Kent Porterfield was a member of the executive staff of the University. He was therefore part of regular meetings with the President. He explained that several Vice Presidents would meet regularly with the President, and that Ms. Fletcher would circulate the "Hot Topics" beforehand, such that the other Executive Staff members could add to them anything they had that was important for the President's addressing. (Exhibit 22 at 11, 107, 109-111).

9

The email from the DPS Director to Bridget Fletcher has not been produced. Nor has any documents reflecting Officer Purvis' alerting his Director to the report of the rape. Nor any documents reflecting how Officer Purvis received the case information (perhaps from the female officer with whom Ms. Oberle spoke?) Nor any documents reflecting Bridge Fletcher or President Biondi responding to Director Titone.

- **Any Record of Officer Purvis' Investigation Prior to December 19, 2006.**

In his declaration to this Court, Officer Purvis states that he began his investigation shortly after December 19 – after receiving a call from Joan Roe's father, and over a month after the report of the sexual assault. (Docket 244 Ex.13). But the "Hot Topics" document indicates that Officer Purvis had been "working the case" from the weekend after the assault. Ms. Oberle testified that she notified DPS immediately after the report of the assault on November 2, 2006. But there are no records of any contacts, investigation, or even preliminary inquiries by DPS prior to the phone call from the victim's father over a month later. Nothing to reflect how Officer Purvis "work[ed] the case", or what he may have found, or, alternatively, why he did not "work[] the case."

Nor has any document been produced reflecting what the President did or did not do, or order, upon receiving this report. Or that would shed some light on why, if Officer Purvis is now telling the truth, and did not investigate until over a month later, he did not "work[] the case as the "Hot Topics" document reflects.

- **Email From DPS Officer Purvis to Claudia Charles Or Any Other Notes of Contact**

In its own chronology of this case (a document that Defendant fought hard to keep from Plaintiff, but was unsuccessful (Docket 125)), SLU memorialized that Larry Purvis

10

had contacted Claudia Charles, the counselor to whom Joan Roe had been sent, in connection with the report of the sexual assault, on November 6, 2006. (Exhibit 23 at 11/6/06). There are no records of this contact. No emails, no notes. Yet somehow this entry made it onto the Defendant's own chronology. Further, this entry contradicts Officer Purvis' currently tendered statement that he did not begin an investigation until over a month later. (Docket 244 Ex. 13).

- **The Standard Operating Procedures Regarding Chain of Command, Methods of Investigation, and Generation of Records**

Defendant has not produced the Standard Operating Procedures for its DPS. These documents would be expected to include provisions for chain of command, methods of investigation, and what records are required to be generated and kept. These may also include particular provisions for sexual assault cases. All of the above instructions would be very important in determining whether some records are understandably missing – or not, and whether additional records, as well, are missing.

An important piece of testimony renders all of the above missing investigation documents even more important. A fellow SLU undergraduate attended the party where Joan was sexually assaulted, and was an eyewitness in the immediate aftermath. In Officer Purvis' January 16, 2007 letter to DPS Director Titone, he stated that he had interviewed Ms. Haberkorn, and wrote that Ms. Haberkorn had said that Joan "'just had too much fun that night'". (Exhibit 24) (quotes in original). Obviously this was meant to cast doubt on whether Joan had indeed been assaulted. But at her deposition in this case, Ms. Haberkorn completely disavowed having said any such thing to Officer Purvis. (Exhibit 25 at 46:3-6). In fact, she also testified to Joan having been crying hysterically

11

after the assault, collapsing in the apartment lobby, not wanting to move, and stating that she had been raped and anally raped. (Exhibit 25 at 30:16-29, 36:5-25, 37:1-8).

(C)  Documents Reflecting That Joan Was Dismissed For Being A Bad Student

It is obviously quite common for college freshman to do poorly on their first college midterms. It is also common for them to rebound and salvage at least adequate grades in their first semester. Defendant argues that Joan was dismissed from her field hockey team for academic performance, but has not produced any documents revealing that her grades were not improving following midterms.

- **Any Notes Or Document Reflecting Joan's Being Late To Study Hall (SLU Chron 11/7/06)**

Defendant's Chronology also has an entry that Joan Roe was 30 minutes late to Study Hall on November 7, 2006, and left early. (Exhibit 23). No documents have been produced that would support this entry, or explain how it came to be.

(D)  Documents Reflecting Additional Avenue of Investigation / Remediation

Defendant relies on a case, *Ostrander v. Duggan*, 341 F.3d 745 (8th Cir. 2003), wherein what the university did vis-à-vis the fraternity in question was found reasonable in response to a report of a sexual assault by a fraternity member. However, Defendant has not produced any documents that reveal any interfaces with the fraternity in this case.

- **Any Notes Or Minutes Of Wardhammer Meetings Or Investigation Of Fraternity**

The SLU Chronology reveals that Linda Wardhammer, the Associate Director of Student Life at SLU, and the adviser to the interfraternity council, was tasked with looking into the situation. (Exhibit 23 at 1/2/07). No documents have been produced that show how she looked into the situation, nor what she found. Further, no documents

12

have been produced that reveal what, if anything, she did to ensure that the fraternity in question safeguarded against a similar assault in the future (in stark contrast to the university in the *Ostrander* case).

(E)   Affidavits or Declarations Reflecting A Thorough Search For Electronic Records

There are obviously many documents that have not been produced that at some point certainly existed. However, there has been no affidavit describing that a thorough search was conducted of the University's servers or email accounts.

## BACK INJURY

As to Plaintiff back-injury claim, she has likewise been unable to obtain documents that would directly rebut Defendant's "facts" and arguments.

In SMUF Nos. 118, 123, 126 and 130, Defendant states that Dr. Rogers, the treating neurosurgeon for Joan's back injury, believes that weight training Joan was made to engage in after the onset of her initial minor injury further herniated a disc in her lower back, but that he does not have the exact specifics of the weight training in question. Nor does another physician. Further, Defendant states that Dr. Rogers cannot speak to whether other field hockey workouts contributed to the injury. SMUF No. 127. This is remarkable, because Defendant had the documents that would prove *exactly* these things in its possession, but they have not been produced.

Plaintiff also will argue these facts in the affirmative – that by being made to do grueling weight lifting, and in particular, max-weight tests, her injury was exacerbated significantly, including the displacement of a disk that will require at least one two surgeries on her back. She will also argue that she was forced to practice, rather than rest her back. And that both of these activities were in violation of doctors' orders. The

13

documents below would be extremely powerful to argue against Defendant's facts and arguments, and in support of her facts and arguments.

1. Detailed Weight Training Index Cards

All of SLU's student athletes were required to fill out and turn in cards reflecting the precise details of their weightlifting workout regimen for each workout, including in particular the amount of weights lifted in various regimens. (Exhibit 26, 27). The head weight trainer at SLU was Tom Keslo, who kept these cards in a box. (Exhibit 27). The cards that Joan Roe filled out and turned in at the end of her sessions have not been produced.

Mr. Kelso has left SLU. Plaintiff's private investigator located him and interviewed him about the note cards. Mr. Kelso stated that he had left the box of cards at SLU. He executed a written statement revealing that nobody from SLU had ever asked him for the whereabouts of this box of records at any time. (Exhibit 27).

2. Head Coach's and Assistant Coach's Team Binders / Calendars

As described in the preceding section, Plaintiff's coaches kept notebooks that detail the drills the players participated and relevant medical issues. But, again, neither the head coach's, nor the assistant coach's, notebooks have been produced.

Moreover, also as described above, there is no reasonable explanation for the failure to produce these notebooks, especially, in particular, that of head coach Marcie Boyer.

3. Athletic Trainer Reports

The athletic trainer for the field hockey team was Melanie Hof. Her role was to ensure that the health of the athletes was safeguarded, by coordinating to make sure that

14

the coaches and weight trainers were copied on Joan's status (e.g. "full participation", "limited participation", or "not cleared to practice or play"), which was determined primarily by a treating physician. (Exhibit 18 at 116, Exhibit 28).

SLU's athletic trainer kept voluminous records of Joan Roe's physical condition, including "Daily Injury Reports", including instructions to the coaches and weight lifting experts on her activity restrictions and status for working out / playing, as she did for all field hockey players with health problems. (Exhibits 4, 5, 6).

The first back pain ever noted for Joan Roe in these AT Reports is dated October 2, 2006. Exhibit 4. On October 3, however, a physician's release form states that Joan's back pain had an onset 5 days earlier, meaning Thursday, September 28, 2006. Exhibit 4. However, AT Reports for September 28, 2006, and for two days before, and three days after, have not been produced.

The missing documents described above would not only provide the additional facts to justify Plaintiff's defense to this motion, they also could (indeed probably would) provide information such that summary judgment was mandated in Joan's favor on her back-injury claim.

### 3. Should The Discovery Sought Still Be Unavailing, The Adjudication of Resultant Discovery Motions Will Provide Essential Sanctions To Oppose Defendant's Summary Judgment Motion

The above items were already the subject of a motion to compel by Plaintiff. A hearing was held on March 16, 2010. To Plaintiff's best recollection, the prior judge hearing this case stated that she was going to deny the motion, without prejudice, such that it could be brought again, but never entered an order doing so. (See Docket 164; Fraser Declaration). Plaintiff will indeed bring such a motion anew, should this

15

opposition in itself not result in the order compelling production of the above-listed items.

Moreover, should the process of searching for the missing documents again prove fruitless, and Defendant state that the documents are non-existent, then Plaintiff will be seeking sanctions for failure to preserve evidence – including, in particular, terminating sanctions against SLU's defenses to the back-injury case and to the Title IX case.

Alternatively, Plaintiff will ask for sanctions giving negative inferences on the facts that are not revealed by the documents – such as an inference that SLU did indeed choose not to investigate the report of the rape; that SLU did indeed choose to punish Plaintiff, rather than help her; that SLU did indeed prioritize its field hockey success over the wellbeing of Joan Roe, which is why she was let go from the team; that SLU's trainers and coaches did indeed ignore their own doctors' orders and have Joan Roe practice and lift weights that caused her back injury.

Should any of the above sanctions be ordered, large parts, and perhaps the entirety of SLU's MSJ, will be rendered irrelevant.

If, on the other hand, these previously non-produced documents were, upon further discovery, to turn up suddenly, then Plaintiff would finally be in a position to depose several critical SLU witnesses. For example, Plaintiff very much wishes to take the deposition of SLU President Biondi, but cannot do so without first learning what he knew, and when he knew it. If the documents turn up, she will be able to take this deposition, and meaningfully. So, too, for President Biondi's assistant, Bridget Fletcher. So, too, for the head of SLU's police department ("DPS"), Jack Titone. So, too, for the DPS investigator who initially took this case, Larry Purvis.

## CONCLUSION

FRCP 56 (d) provides for several remedies. In this instance, the MSJ should be denied, or, in the alternative, deferred. Additional discovery should be undertaken, with Orders compelling that documents be produced, and, if not, Orders should be made that Defendant SLU is stripped of its back injury and Title IX defenses -- other than a damages argument.

Respectfully submitted,

LAW OFFICES OF DAVID J. FRASER

By:     /s/ David J. Fraser
David J. Fraser
Attorney for Plaintiff Joan Roe

17